# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 20, 2014          Decided April 17, 2015

No. 14-1024

CHARLES WEIGAND,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

On Petition for Review of an Order of
the National Labor Relations Board

———

*John N. Raudabaugh* argued the cause and filed the briefs for petitioner.

*Heather S. Beard*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Usha Dheenan*, Supervisory Attorney. *Robert J. Englehart*, Supervisory Attorney, entered an appearance.

Before: KAVANAUGH, *Circuit Judge*, SRINIVASAN, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Charles Weigand ("Weigand") petitions for review of a decision and order of the National Labor Relations Board ("Board"). Weigand claims that the Board erred in dismissing his charge that the Amalgamated Transit Union, Local Union No. 1433, AFL-CIO ("Union" or "Respondent") violated Section 8(b)(1)(A) of the National Labor Relations Act, ("NLRA" or the "Act"), 29 U.S.C. § 158(b)(1)(A), by failing to remove derisive and allegedly threatening comments posted on a Facebook page maintained for Union members. The disputed comments, which were written by some Union members without the permission of the Union, appeared on Facebook when the Union was on strike against Veolia Transportation Services in Phoenix, Arizona ("Veolia" or the "Employer"). The Facebook postings made disparaging remarks about people who crossed the Union's picket line. Weigand filed a charge with the Board's Acting General Counsel, who issued a complaint alleging that the Union had committed an unfair labor practice in violation of Section 8(b)(1)(A).

During the hearing before the Administrative Law Judge ("ALJ"), the General Counsel argued that the Union had a "duty to disavow" the Facebook comments, just as it might have a duty to disavow picket-line misconduct. *Amalgamated Transit Union, Local Union No. 1433* ("*Amalgamated Transit Union*"), 360 N.L.R.B. No. 44 (Feb. 12, 2014), slip op. at 5. The ALJ rejected the General Counsel's position, holding that the "Facebook page is in no way 'an electronic extension' of [the Union's] picket line." *Id.* The Board largely affirmed the judgment of the ALJ. *Id.* at 1 & n.1. With respect to the matter now before this court, the Board held that the Union was not responsible for the Facebook comments because "the

individuals who posted the comments were neither alleged nor found to be agents of the [Union]." *Id.* at 1 n.1. Two members of the Board's three-person panel also held that the Facebook comments did not violate the Act because they were not "threats" under Section 8(b)(1)(A). *Id.*

In his petition for review, Weigand does not challenge the Board's finding that the persons who posted the allegedly threatening comments at issue in this case were not agents of the Union. Instead, he argues that the Union should be held responsible for the Facebook entries posted by Union members because a Union officer controlled the Facebook page. We disagree and therefore deny Weigand's petition for review.

In accepting most of the ALJ's proposed rulings, findings, and conclusions, the Board embraced the position that the comments on the Union's private Facebook page were not analogous to misconduct on a picket line. Undergirding this position are two important findings: first, the Facebook page was not accessible or viewable by anyone other than active Union members – that is, the derisive messages were not aimed at either the public at large or at non-union persons who opted to cross the picket line; and second, the disputed postings were made by persons who acted on their own without the permission of the Union. In the Board's view, the second finding is critical and dispositive. *See id.* at 1 n.1. In light of these findings, the Board concluded that the Union was not liable for the contested speech posted by persons who were not acting as agents of the Union.

The Board's decision regarding the Facebook postings is "the product of reasoned decisionmaking," *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983), and it is supported by the record. In

circumstances such as this, "[w]hen the NLRB concludes that no violation of the NLRA has occurred, that finding is upheld unless it has no rational basis or is unsupported by substantial evidence." *United Steelworkers of Am., Local 14534 v. NLRB*, 983 F.2d 240, 244 (D.C. Cir. 1993) (internal quotation marks omitted). On the record before us, we have no basis to overturn the Board's judgment that the Union was not liable for the acts of non-agents. We need not reach the question whether the disputed Facebook postings were "threatening," *i.e.*, in the sense that they might have constituted a violation of Section 8(b)(1)(A) if made by agents of the Union. We leave this issue for another day.

Finally, in adopting the ALJ's finding that the Union "did not violate the Act by failing to remove certain comments from its Facebook page," the Board found it "unnecessary to rely on the [ALJ's] application of the Communications Decency Act, 47 U.S.C. § 230" ("CDA"). *Amalgamated Transit Union*, 360 N.L.R.B. No. 44, slip op. at 1 n.1. Weigand argues that "[t]he Board erred in refusing to consider and reverse the ALJ's holding that the Union is not liable under the CDA for posting threats on its Facebook page." Br. for Petitioner 6. We disagree. In resolving this case, the Board properly applied the applicable law under the NLRA. Therefore, we agree with Board counsel that the Board "did not need to analyze the CDA as an additional defense for the Union, let alone consider Weigand's unsupported assertion that the CDA somehow constitutes an affirmative cause of action necessary to the Board's analysis." Br. for the NLRB 11.

## I. BACKGROUND

### A. *Statutory and Legal Background*

Section 7 of the NLRA protects employees' rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 7 also guarantees the right to "refrain from any and all of such activities." *Id.*; *see also NLRB v. Granite State Joint Board, Textile Workers Union of America, Local 1029*, 409 U.S. 213, 216 (1972) ("Under § 7 of the Act the employees have 'the right to refrain from any or all' concerted activities relating to collective bargaining or mutual aid and protection . . . ."). Section 8(b)(1)(A) of the Act makes it "an unfair labor practice for a labor organization or its agents . . . to restrain or coerce . . . employees in the exercise of [their Section 7 rights]." 29 U.S.C. § 158(b)(1)(A).

### B. *Facts*

At all relevant times, the Union was the exclusive representative of a bargaining unit of full-time and part-time bus drivers employed by Veolia. Weigand was an employee of Veolia and a member of the collective bargaining unit represented by the Union, but he was not a Union member. From 2011 to 2012, the Union and Veolia were engaged in collective bargaining negotiations regarding the terms of a successor agreement. A breakdown in the negotiations led to a six-day strike in March of 2012. During the negotiations and the strike, the Union used the Facebook page to communicate with members about its progress and its planned picket lines.

The Union's Facebook account was created in 2010 by then-Union Vice President Michael Cornelius ("Cornelius"). The Facebook page could only be accessed by Union members who were employed and in good standing with the Union. No other persons had access to the site or could post comments on the Facebook page. Leading up to and during the strike, communications on the Facebook page by Union members were often impassioned and bellicose. For example, the posted comments included a rhetorical question asking if the picketers could "bring the Molotov Cocktails" to picket the hotel where the "scabs" were being housed. *Amalgamated Transit Union*, 360 N.L.R.B. No. 44, slip op. at 4. However, there were no allegations or findings of violence or untoward disturbances during the Union strike.

## C. *Proceedings Below*

In April 2012, Weigand filed an unfair labor practice charge with the Board alleging that the Union had restrained and coerced him in the exercise of his Section 7 rights. The Acting General Counsel filed a complaint against the Union alleging violations of Section 8(b)(1)(A) on the basis of the posts on the Union's Facebook page, statements made by Cornelius at a monthly membership meeting on May 20, 2012, and verbal statements made by Union executive board members and strike team leaders to persons who crossed the picket line.

The Complaint alleged, in particular, that in mid-January of 2012, comments posted on the Union's Facebook page "threatened employees with less favorable representation" and "with physical harm because employees refused to participate in Respondent's strike against the Employer." *Amalgamated Transit Union*, 344 N.L.R.B. No. 44, slip op. at 3. The Complaint also alleged that in March of 2012, the Union's

Facebook page "threatened employees with violence by the use of explosives because employees refused to participate in Respondent's strike against the Employer." *Id.*

The ALJ found that the Facebook page was limited to Union members in good standing. Indeed, as noted above, the record is clear that no persons could post comments or even see the Facebook page to view comments that had been posted, unless they were members in good standing with the Union.

It was neither alleged nor found that any of the contested comments on the Facebook page had been posted by Union officials or agents. And the Acting General Counsel did not assert that the Union should be held liable for its members' Facebook comments because the members were acting as agents of the Union. *Id.* at 5. On this point, the Acting General Counsel made it clear that "the Government does not rely on an agency theory" in seeking to hold the Union liable for the statements of members who acted on their own without permission from the Union. *Id.* Rather, the Acting General Counsel advanced a theory that the Union had a "duty to disavow" any statements posted on the Facebook page that were "unlawful threats." *Id.* at 3. In support of this theory, the Acting General Counsel relied on case law that holds a labor organization responsible for its members' picket-line misconduct when it does not correct or disavow the misconduct. The Acting General Counsel thus argued that the Union's Facebook page was "an electronic extension of Respondent's picket line." *Id.* at 5. The ALJ rejected this argument.

The ALJ's opinion on this point, which was adopted by the Board, offers the following rationale:

A picket line proclaims to the public, in a highly visible way, that the striking union has a dispute with the employer, and thus seeks to enlist the public in its effort to place economic pressure on the employer. . . . The picket line also signals to employees – both employees of the struck employer and, in certain instances, employees of other employers – that there is a labor dispute, to the end that these employees will not cross the picket line but instead will withhold their services. Thus, a picket line makes visible in geographic space the confrontation between the two sides.

In contrast, Respondent's Facebook page does not serve to communicate a message to the public. To the contrary, it is private. Moreover, it does not draw any line in the sand or on the sidewalk.

Unlike a website in cyberspace, an actual picket line confronts employees reporting for work with a stark and unavoidable choice: To cross or not to cross. Should someone acting as a union's agent make a threat while on the picket line, the coercive effect is immediate and unattenuated because it falls on the ears of an employee who, at that very moment, must make a decision concerning the exercise of his Section 7 rights.

Considering the marked differences, the Respondent's Facebook page certainly does not amount to an extension of Respondent's picket line and was not created for that purpose. Respondent's vice president, Cornelius, fashioned the website to be a forum for the sort of unfettered, candid discussion which typifies the Internet.

*Id.*

As noted above, the Complaint also alleged that the Union had committed unfair labor practices based on conduct

apart from the Facebook postings. As to one such complaint, the ALJ found that statements made by Cornelius during a Union membership meeting – which included a remark that the persons who leaked the contents of the Facebook page to the NLRB "should be ashamed of themselves" – did not violate Section 8(b)(1)(A) because the statements were not threats. *Id.* at 6. The ALJ also addressed a charge that Union agents at the picket line threatened employees who crossed the line. He found that these actions were coercive and constituted unfair labor practices in violation of Section 8(b)(1)(A). *Id.* at 10.

The NLRB largely adopted the ALJ's rulings, findings, and conclusions. *See id.* at 1 & n.1. Two of the Board members, Chairman Pearce and Member Hirozawa, would have affirmed the ALJ's proposed Order as to the Facebook comments on two grounds: that the comments were not threats under Section 8(b)(1)(A) of the NLRA and that the people who made those comments were not agents of the Union. *Id.* One Board member, Member Miscimarra, believed that at least some of the comments could have been perceived as threats. He concurred in the judgment, however, on the ground that the Union was not responsible for the Facebook comments that had been posted by non-agents. *Id.*

The Board agreed with the ALJ that the Union had violated Section 8(b)(1)(A) when its agents made threatening statements to employees on the picket line. The Board thus ordered that the Union: (1) "[c]ease and desist from . . . [t]hreatening employees that they will receive less favorable representation because they exercised their right to refrain from participating in a strike"; (2) cease and desist from "restraining or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act"; (3) post and distribute electronically a notice to employees of their rights

under Section 7. *Id.* at 1. The Union has complied with the Board's order. Br. for the NLRB 9 n.6.

Weigand filed this petition for review, challenging only the Board's order regarding the Facebook comments.

## II. ANALYSIS

"As we have noted many times before, our role in reviewing [a] NLRB decision is limited. We must uphold the judgement of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011) (internal quotation marks omitted). We afford "a very high degree of deference to administrative adjudications by the NLRB." *United Steelworkers*, 983 F.2d at 244. Where, as here, the Board adopts the ALJ's findings and conclusions as its own, we apply the same deferential standard to those findings and conclusions. *NLRB v. KSM Indus., Inc.*, 682 F.3d 537, 544 (7th Cir. 2012).

Before addressing the merits of this case, we must dispose of arguments that Weigand has raised for the first time on appeal. In his brief to the court, Weigand points to two allegedly threatening comments posted on the Facebook page by Cornelius when he was Union Vice President. Br. for Petitioner 5. These claims came too late. In the Acting General Counsel's complaint and in the briefing before the ALJ and the Board, it was never alleged that Facebook comments posted by Cornelius constituted unfair labor practices. The General Counsel, not the Charging Party, has discretion to decide whether or not to issue a complaint, and

therefore exclusively controls the issues contained in the complaint. *See* 29 U.S.C. § 153(d) (providing that the General Counsel "shall have final authority . . . in respect of the investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board"); *see also Int'l Union of Operating Eng'rs, Local 150 v. NLRB*, 325 F.3d 818, 830 (7th Cir. 2003). Furthermore, although Weigand's exceptions to the ALJ's decision referenced a comment posted by Cornelius, he never specifically challenged the ALJ's failure to find that the Union committed any unfair labor practices on the basis of any comment made by Cornelius. *See N.Y. & Presbyterian Hosp. v. NLRB*, 649 F.3d 723, 733 (D.C. Cir. 2011) (holding that respondent failed to preserve issue on petition for review where "the language [in respondent's exceptions to the ALJ's decision] was too broad to put the Board on notice" of respondent's specific objection). And during oral argument, counsel for Weigand conceded that his client was not claiming that any comments posted by Union agents were threats. Therefore, Weigand's belated claims regarding Cornelius are not properly before the court. Section 10(e) of the Act prevents us from considering an argument raised for the first time on appeal. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").

The sole question before the court is whether the Board's holding that the Union was not liable for the contested speech posted on Facebook by persons who were not acting as agents of the Union is supported by the record and consistent with applicable law. In considering this question, our starting point is Section 8(b)(1)(A), which applies only to conduct by "a labor organization or its agents." 29 U.S.C. § 158(b). If

neither the Union nor one of its agents is responsible for the cited conduct then the conduct cannot form the basis of an unfair labor practice charge against the Union.

Ordinarily, "[t]he agency relationship must be established with regard to the specific conduct that is alleged to be unlawful." *Cornell Forge Co.*, 339 N.L.R.B. 733, 733 (2003). Thus, in the context of alleged misconduct on a Union picket line,

> [t]he Board will, in applying these agency principles, impute the conduct of the union's pickets to the union only where it is shown that the union, either actually or impliedly, authorized the picket's conduct beforehand or ratified the conduct after it occurred. For example, where an authorized union representative such as a union official or picket captain participates in picketing misconduct or is present at the time the misconduct occurs, the Board will not hesitate to find that the union is responsible. Similarly, where the union has knowledge of its pickets' misconduct, but fails to take steps "reasonably calculated" to control that misconduct, the Board readily imputes responsibility for the misconduct to the union.

*Teamsters Local 860, Int'l Bhd. of Teamsters*, 229 N.L.R.B. 993, 994 (1977) (footnotes omitted) (holding that union could not be responsible for isolated misconduct by picketers that it was not aware of and had expressly forbidden); *see also Soft Drink Workers Union Local 812*, 307 N.L.R.B. 1267, 1272–73 (1992) (finding union violated Section 8(b)(1)(A) by violent misconduct committed by its strikers, when acts were done in the presence of union agents or done with apparent authority of the union, but not when an alleged assault was committed apart from any union activity and the striker

involved in the incident disappeared from the picket line, "indicating that the union did not condone" his actions).

Even when there has been violence during a strike, the Supreme Court has said that, while "[n]ational labor policy requires that national unions be encouraged to exercise a restraining influence on explosive strike situations . . . [t]here can be no rigid requirement that a union affirmatively disavow such unlawful acts as may previously have occurred." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 739 (1966). "What is required," the Court has stated, "is proof, either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law or intentionally drew upon the previous violence for their force." *Id.*

Weigand argues that "[w]hen a union officer/agent creates and controls access to a union Facebook page, actively participates [in] and initiates Facebook postings, participates in unlawful misconduct or fails to admonish online union members when misconduct occurs, the union should be held responsible." Br. for Petitioner 8. However, the cases cited by Weigand involve misconduct on the picket line, which the Board found inapposite. In adopting the ALJ's opinion, the Board reasoned that a private Facebook page available only to union members is nothing like a Union's picket line. In the Board's view, a picket line – unlike a *private* Facebook page – is a "highly visible" signal to the public and all employees of a dispute with the employer and the "coercive effect" of a threat made on a picket line is "immediate and unattenuated." *Amalgamated Transit Union*, 360 N.L.R.B. No. 44, slip op. at 5. Weigand does not challenge the Board's reasoning, and we have no legitimate legal basis upon which to question it. In stark contrast to violence or threats occurring on a picket line,

the speech complained of here occurred on a private forum on the internet that was meant for Union members' eyes only.

Weigand also argues that a union has a duty to disavow allegedly threatening conduct that occurs out of the context of picket line misconduct. In support of this position, he cites *Battle Creek Health System*, 341 N.L.R.B. 882 (2004), and *NLRB v. Bulletin Co.*, 443 F.2d 863 (3d Cir. 1971). Reply Br. for Petitioner 8. These cases are readily distinguishable, however, because they involved situations in which union officials or their agents were implicated in the misconduct. In *Battle Creek*, the Board found that the union had committed an unfair labor practice based on threats made by a union agent in the employee break room. 341 N.L.R.B. at 892–93. The union's liability in that case was explicitly based on an agency relationship. *Id.* at 894 ("I conclude that Mietz'[s] statements, made as an agent of the Union, violated Section 8(b)(1)(A) of the Act."). In *Bulletin Co.*, the Board found that the union had "ratified and condoned" "continual" harassment and violent behavior towards non-union workers, that the employer had complained to the union president to no avail, and that the misconduct had escalated to a point where the workers were sent home "for their own protection." 443 F.2d at 865–67 & n.4. These cases clearly do not support Weigand's position in this case.

The Union here did not authorize or otherwise condone the posting of the contested messages on the Facebook page. Weigand tries to overcome this point by suggesting that, in maintaining the Facebook page, the Union somehow facilitated the publication of threats against persons who opted to cross the picket line. The record simply does not bear this out. The Facebook page was private, for Union members only. Indeed, Weigand and other non-Union persons could not view the comments on the Facebook page. Therefore, the

most that can be said here is that the Union's maintenance of the Facebook page facilitated communications between Union members, not threats against non-Union employees as in the cases cited by Weigand. The Board reasonably concluded that this was not a violation of the Act.

It is undisputed in this case that the Union members who posted the comments on Facebook were not agents of the Union. It is also undisputed that the Facebook page was private to Union members only and was not meant to be seen by anyone outside of the Union. Therefore, we have no occasion to consider whether the legal considerations might be different in a case in which real "threats" were posted by union members on an open Internet site, *i.e.*, communicated in an open forum that could be readily viewed by persons who were the subjects of the threats. Nor do we mean to suggest that the Board is foreclosed from ever finding a union guilty of unfair labor practices for postings on "closed" Internet sites. We are in no position to speculate about the range and limits of communications in the fast-changing world of social media. Our denial of the petition for review is thus limited to the record before us.

## III. CONCLUSION

For the reasons set forth above, the petition for review is denied.

*So ordered.*