# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 8, 2018                    Decided June 15, 2018

No. 16-1338

MARK TAMOSIUNAS, ET AL.,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITE HERE!, LOCAL 5,
INTERVENOR

On Petition for Review of an Order
of the National Labor Relations Board

*Glenn M. Taubman* argued the cause for petitioners. With him on the briefs were *Sarah E. Hartsfield* and *Aaron B. Solem*.

*Valerie L. Collins*, Attorney, National Labor Relations Board, argued the cause for respondent.    With her on the brief were *Richard F. Griffin*, *Jr.*, General Counsel at the time the brief was filed, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Julie B. Broido*, Supervisory Attorney.

*Eric B. Myers* argued the cause and filed the brief for intervenor Unite Here!, Local 5.

Before: MILLETT and WILKINS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*:   Several Hyatt Regency Hotel employees in Hawaii objected to and formally declined full membership in their union.   Nonetheless, they received a letter from the union requiring immediate payment of full union dues—that is, dues owed by employees who chose to join the union in full.   The letter went on to inform the employees that the Hyatt Regency Hotel would soon be deducting the amounts necessary to pay full union dues from future paychecks at the union's behest.   The Board concluded that, in its view, the letter was an obvious mistake and no reasonable employee reading it would have felt pressured to pay the demanded full union membership dues.   The union, for its part, neither acknowledged that the letter was a mistake, nor apologized for sending the dues demand to employees who it knew had formally objected to joining the union.

The Board's decision is legally unsupportable on this record.   The letter demanded payment from individuals the union knew had rejected full membership, and it simultaneously initiated the garnishment process to collect the full dues.   That letter reasonably tended to coerce or restrain the objecting Hyatt employees in the exercise of their statutory right to limit their association with the union.   Accordingly, we grant the employees' petition, vacate the Board's decision, and remand for further proceedings consistent with this opinion.

3

**I**

**A**

The National Labor Relations Act ("the Act") protects an employee's right to "bargain collectively through representatives of [his or her] own choosing"—a guarantee that is commonly referred to as a worker's "Section 7" rights. 29 U.S.C. § 157 (codifying Section 7 of the Act). Importantly, Section 7 equally protects the inverse right: the right to abstain from unionization. *Id.* To enforce that right, the Act prohibits both employers and labor unions from engaging in "unfair labor practices," including any behavior designed to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" Section 7. *Id.* § 158(a), (b)(1)(A) (codifying Section 8 of the Act). In other words, restraining an employee from exercising her right to abstain from union membership constitutes an unfair labor practice. So does coercing an employee not to exercise that right.

There are a few exceptions: the prohibition on unfair labor practices does not preclude an employer from agreeing to require union participation "as a condition of employment," assuming the relevant union meets certain statutory prerequisites. 29 U.S.C. § 158(a)(3). And it does not impair a union's ability to prescribe its internal membership standards. *Id.* § 158(b)(1).

When an employer requires union membership as a mandatory condition of employment, the law allows employees to choose between becoming full members or "core" financial members. Unlike full members, "core" members pay a reduced annual fee ("core fee") to cover their fair share of the union's representative work that aims to benefit all employees. *NLRB v. General Motors Corp.*, 373

U.S. 734, 742 (1963) ("'Membership' as a condition of employment is whittled down to its financial core.").

The obligation to pay core fees applies to all employees, even those opposed to union representation. That is because, once a union becomes the collective bargaining agent for employees in a work unit, the union is required by law to represent the interests of *all* employees equally, even those that do not support the union. *Emporium Capwell Co. v. Western Addition Cmty. Org.*, 420 U.S. 50, 64 (1975). That task "entails the expenditure of considerable funds" and resources. *International Ass'n of Machinists v. Street*, 367 U.S. 740, 760 (1961). Also, the benefits obtained by the union in negotiating with the employer—such as pay, work opportunities, vacation and sick leave—redound to the benefit of core members just as much as full union members. For those reasons, requiring core members to pay their fair share of union expenses incurred on behalf of the entire workforce best accommodates the associational rights of all employees while preventing freeloading by employees and providing unions with the resources necessary to perform effectively their representative duties to all employees. *See International Ass'n of Machinists*, 367 U.S. at 750, 760–764 ("Activities of labor organizations resulting in the procurement of employee benefits are costly * * *. We believe that it is essentially unfair for nonmembers to participate in the benefits of those activities without contributing anything to the cost.").

In short, though full union members pay a higher rate and, in exchange, receive the right to participate in internal union affairs and benefit programs, "core" members still qualify as union "members" for purposes of retaining their contractual right to "continued employment" by paying their fair share of union activity undertaken on behalf of all employees.

**B**

Mark Tamosiunas, Steven Taona, Agnes Demarke, and Wayne Young (collectively, the Objecting Employees) provide hospitality services for the Hyatt Regency Hotel in Waikiki, Hawaii. Since at least 2006, "Unite Here!," Local 5, a labor union, has represented hotel hospitality workers in Hawaii, including those at the Hyatt Regency Hotel.

Between July 1, 2006 and June 30, 2010, a collective bargaining agreement governed relations between Local 5 and the Hyatt Regency Hotel. Among many other things, this agreement included a "union security clause," which required all Hyatt employees to become or remain either full or core members of Local 5 "as a condition of continued employment." J.A. 11.

From the start, the Objecting Employees have participated in Local 5 solely as "core" members. They have consistently objected to the payment of any additional fees for "nonrepresentational activities." J.A. 11.

When the Hyatt collective bargaining agreement terminated at the end of the day on June 30, 2010, so did the union security clause obligating Hyatt employees to maintain at least core membership in Local 5. That left Hyatt's employees—both the core and full union members—free to continue or abandon union membership as they pleased. The Objecting Employees waited two years and then broke rank. Each informed Local 5 in writing that they would no longer allow the Hyatt to remit their core fees to the union. They added, however, that should Local 5 "secure a compulsory dues contract" in the future, they would recommence payment of the "required amount of dues," which the letters defined as the "reduced fair share amount for financial core members." J.A.

71–74.

In August 2013, the union secured just such an agreement. That contract, like the one before it, contained a union security clause.   It read as follows:

Section 7.   UNION SECURITY

7.01    Employees who are now members of the Union shall, as a condition of continued employment, remain members of the Union. All other employees and all new employees shall, as a condition of continued employment, become members of the Union no later than the thirty-first (31st) day following the execution of this Agreement or their date of employment, whichever is later.

7.02    Five (5) days after receipt of written notice from the Union that an employee has failed to tender his uniform dues and initiation fees * * *, Hyatt shall suspend such employees for seven (7) days pending termination.    If within the seven (7) day period of suspension the Union notifies Hyatt that the employee has complied with Section 7.1, the employee shall be immediately reinstated to work without back pay.    If Hyatt is not so notified by the Union the employee shall be discharged and shall not have access to the grievance procedure as provided in Section 18 of this Agreement.

J.A. 11.

Soon after securing this agreement, Local 5 sent letters to

each of the Objecting Employees entreating them to rejoin the union as full members (the October 2013 letters).   The letters indicated that Local 5 was aware that the employees had requested to pay only core fees in the past, but encouraged them to reconsider the "benefits of full union membership" in light of the favorable collective bargaining agreement that had been obtained and to "make arrangements to pay the arrearages" accrued to date.   J.A. 75–78.   The letters concluded with a note identifying the specific amount of dues outstanding that would need to be paid to reinstate full membership privileges for the individual employee.

Since the Objecting Employees' views of the Union had not warmed, they chose to remain only as core members. Nevertheless, on March 31, 2014, they each received a billing letter from Local 5, demanding payment of full membership dues ("Dues Letter").   Aside from the names and amounts due, the Dues Letters were identical:

> THIS IS A STATEMENT OF YOUR ACCOUNT AS OF THE ABOVE DATE. Your dues must be made current.   To facilitate this we have billed your employer for the balance listed below.   A deduction will be reflected on an upcoming pay stub.   If your employer doesn't deduct arrearages, you are responsible for paying this balance directly to Local 5.
>
> Please be advised that the International Constitution Rules affirmed by Local Union 5 Bylaws must suspend any Member whose Dues are more than TWO Months in arrears.
>
> ATTENTION FOOD SERVERS:   Please note

that if there are insufficient funds available in your weekly paycheck to cover dues deductions, then you are responsible for sending your union dues directly to Local 5. PLEASE REMIT THE BALANCE STATED. Your prompt payment is appreciated.

J.A. 79.

The Dues Letter also contained an individualized chart itemizing the amount of dues owed, along with a final line item denoted "Total Balance due." J.A. 79–86.

The same day it sent those letters, Local 5 also contacted Hyatt. In an email, Local 5 informed Hyatt that it had sent out the Dues Letters and advised Hyatt that it would be "submitting a billing report for March" identifying the amount of union fees individual employees owed. J.A. 87–89. Local 5 requested that Hyatt process this billing—that is, garnish the unpaid fees from employees' paychecks—in the upcoming pay period. J.A. 89.

Consistent with that request, on April 11, 2014, Hyatt deducted up to the maximum amount of $62.50 from the paychecks of the Objecting Employees and other core members. Hyatt soon learned of the error, and it promptly sent a letter to the Objecting Employees and other affected workers, acknowledging the mistaken garnishment and assuring that it would credit their upcoming paychecks for the amount improperly remitted to the Union.

Local 5, for its part, remained silent.

Unsatisfied, the Objecting Employees filed a complaint with the National Labor Relations Board on April 28, 2014,

charging Local 5 with a variety of unfair labor practices prohibited by the National Labor Relations Act. More specifically, the Objecting Employees alleged that the Union's demand for retroactive full union dues and promised garnishment of their wages represented an effort both to restrain them from exercising their Section 7 right not to join the union in full and to coerce them not to exercise that right. J.A. 59–60. The charge also claimed that Local 5 had endeavored to apply the August 2013 union security provision retroactively to collect dues for a period not governed by the collective bargaining agreement.

With charges pending, Local 5 took some action of its own. On May 13, 2014, the Union sent a letter only to the Objecting Employees who had filed the charges (but for some unexplained reason, not to all of the other core employees who had also wrongly received the Dues Letter). The Union's May 2014 letters "clarif[ied] the March 31, 2014 [Dues] letter," stating that the billing amounts contained in the letters just identified "the amount of dues [needed] to become a member in good standing with the Union," not the smaller amount of core fees needed to retain one's employment. J.A. 136. Local 5's May 2014 letter stressed that the Dues Letter did "not refer to the union security clause" or otherwise "threaten [any employee's] continued employment." *Id.* Rather, the Letter raised only the specter of a suspension in "*Union membership*." *Id*. (emphasis in original).

An administrative law judge concluded that the Dues Letter did not expressly or impliedly threaten the employees beyond threatening to suspend union membership, a matter of internal self-governance. On that basis, the administrative law judge found no unlawful coercion of the Objecting Employees' Section 7 rights. The administrative law judge did not address whether the letters also "restrained" the

employees in their exercise of Section 7 rights, framing the issue in terms of threats and coercion alone.   J.A. 149.

The Board, in a divided opinion, agreed with the administrative law judge.   The Board acknowledged that the administrative law judge had phrased his inquiry as whether the letter amounted to a "*threat* or coercion," J.A. 140 n.1 (emphasis added), while the statutory language referred to "conduct that *restrain[s]* or coerce[s]" employees, 29 U.S.C. § 158(b)(1)(A) (emphasis added).   But the Board ruled that this "use of different terminology did not affect [the] analysis."   J.A. 140 n.1.

The Board also ruled that "the only objectively reasonable view of the letter, in context, was that it was mistakenly directed" to the Objecting Employees.   J.A. 141.   In support of that conclusion, the Board reasoned that the letter (i) sought full membership dues (not just core fee arrearages); (ii) relied on internal board rules and regulations (not a union security clause or other contractual requirement); (iii) suggested a suspension in union membership (and not employment) would occur if dues went unpaid; and (iv) did not incorporate or imply any other adverse consequences in the event of non-payment. The Board added that Local 5 had indicated in its initial October 2013 letter that the union dues obligation fell only upon "full" union members.   *Id.* 140–141.

Member McFerran dissented.   In her view, the Union's demand of "dues from employees who did not owe them" by itself constituted an unfair labor practice.   J.A. 141.   "To be told that you are delinquent in paying a bill," she concluded, "and that steps to collect will be taken, obviously has a reasonable tendency to coerce payment from you—which was precisely the point of the [Union's] letter, on its face."   *Id.* 142.   Member McFerran also pointed out that the garnishment

of dues from an upcoming paycheck was itself an adverse consequence with which the Board and judge had failed to grapple. Finally, she concluded that the October 2013 letter, even if relevant, did "not preclude an alternative, reasonable, and coercive construction—all that [the Board] requires to find a violation." *Id.* 143.

## II

### A

The Board has primary responsibility for applying "the general provisions of the [National Labor Relations] Act to the complexities of industrial life." *Pattern Makers' League of North America, AFL-CIO v. NLRB*, 473 U.S. 95, 114 (1985) (internal quotation marks and citations omitted). When the Board's construction of the Act is reasonable, it cannot be rejected "merely because the courts might prefer another view of the statute." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497 (1979). But when the Board's findings are not supported by substantial evidence, the Board has acted arbitrarily, or the Board has otherwise erred in applying established law, the court must intervene. *Weigand v. NLRB*, 783 F.3d 889, 894–895 (D.C. Cir. 2015).

This case demands our intervention. The Board's decision falls far short of the substantial evidence needed to satisfy its own governing legal standard: that no reasonable employee could interpret the March 2013 Dues Letter as an effort to restrain her from exercising her right not to pay the dues for full union membership or to coerce her into paying such dues. *See Service Employees Int'l Union, Nurses Alliance, Local 121RN* (*Pomona Valley Hosp.*), 355 N.L.R.B. 234, 235 (2010).

Heavy-handed threats and sanctions will, of course, rise to the level of coercing or restraining the exercise of Section 7 rights and so will readily qualify as unfair labor practices prohibited by Section 8 of the National Labor Relations Act, 29 U.S.C. § 158. *See NLRB. v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 186 (1967) (describing the legislative purpose behind Section 8(b) as addressing "threats of reprisal against employees and their families"); *see also International Union of Dist. 50, UMW* (*Ruberoid Co.*), 173 N.L.R.B. 87, 87 (1968) ("[T]he Respondents violated Section 8(b)(1)(A) of the Act by threatening employees with discharge or with loss of retroactive contract benefits if they refused to sign an authorization for checkoff of dues[.]").

But Section 8's protective cloak sweeps far more broadly, proscribing any action by an employer or union that "has a reasonable tendency" to coerce or restrain employees in the exercise of their Section 7 rights. *See Enterprise Leasing Co. of Florida v. NLRB*, 831 F.3d 534, 543 (D.C. Cir. 2016) (interpreting Section 158(a)(1), the analogous employer provision); *see also Helton v. NLRB*, 656 F.2d 883, 889 (D.C. Cir. 1981) (concluding that any textual differences between the provisions governing employer and union conduct were "not intended to indicate that union conduct should be measured against a less demanding standard than employer conduct"); *see also NLRB v. Service Employees Int'l Union, Local 254, AFL-CIO*, 535 F.2d 1335, 1337–1338 (1st Cir. 1976) (applying the "reasonably tend to coerce" test to an allegation of union misconduct).

Accordingly, implied threats may run afoul of Sections 7 and 8. *See Helton*, 656 F.2d at 887 (holding that Section 8(b)(1)(A) "is not limited to union conduct involving threats of violence or economic coercion"); *International Bhd. of Elec. Workers, AFL-CIO v. NLRB*, 487 F.2d 1113, 1119 (D.C. Cir.

1972) (holding that the National Labor Relations Act "prohibits *indirect* union restraint or coercion of an employer" in addition to direct coercion or restraint); *Pomona Valley Hosp.*, 355 N.L.R.B. at 235 (same). For example, threats to "refer claims * * * to a collection agency" or to "institute court action" to recover unpaid union dues from objecting employees constitute unlawful coercion. *International Bhd. of Elec. Workers, Local No. 396* (*Central Tel. Co.*), 229 N.L.R.B. 469, 469–470 (1977) ("[W]e view [the union's] efforts to collect dues from nonmembers * * * as coercive and in violation of Section 8(b)(1)(A).").

The Board goes further still. Under its precedent, whether a communication will be restraining or coercive turns on "whether the words *could* reasonably be construed as coercive," even if that is not the "only reasonable construction." *Pomona Valley Hosp.*, 355 N.L.R.B. at 235 (emphasis added). Under that standard, if any reasonable employee could view the communication as coercive or restraining, the union (or employer) has violated the law.[1]

Given how jealously the Board's decisions protect employees' Section 7 rights, the Board's decision in this case makes no sense. Directly requiring the Objecting Employees to pay full-membership dues would collide head-on with their Section 7 rights. That much is not disputed. Yet the text of the Dues Letter reads very much like a payment demand. Each Objecting Employee's letter included an individualized

---

[1] Because the parties do not contest this standard, we take no position on whether the Board's "any reasonable employee" framework provides the proper lens through which to view a Section 8 violation. In any case, if the Board deviated from its own standard without explanation, it has acted arbitrarily. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

accounting of the amount purportedly outstanding, and then said that the employee "must" come current with those dues. J.A. 79–86. Each letter also said that the employee was personally "responsible" for the overdue amounts. *Id.* And each advised that the employee "please remit the balance stated" "prompt[ly]." *Id.*

If the employee retained any lingering hope of choice in the matter, the letter disabused her of it by advising that failure to pay would result in the garnishment of her wages. That was no idle threat either. The Dues Letter was explicit that Local 5 had already set the forced-collection wheels in motion by "bill[ing] [the] employer for the balance listed" so that a "deduction *will be* reflected on an upcoming pay stub." J.A. 79 (emphasis added). And that is exactly what happened. At the Union's urging, Hyatt extracted dues payments from each Objecting Employee's next paycheck.

The Union, in short, tried to fulfill through the back door of employer garnishment the same direct demand for employee payment that Section 8 forbids on the front end. The only choice about paying full union dues that was left to the employee was, in effect: "We can do this the easy way, or we can do this the hard way." Either way, the employee's Section 7 choice to pay only core fees evaporated. That is the very definition of coercion and restraint. Or at least a reasonable employee could think so.

The Board concluded that no sensible employee would have read the Dues Letter as compelling or coercing a payment of full union dues. The Board found it relevant that the Letter (1) only sought arrearages for unpaid full union dues, not core representational fees; (2) relied solely on internal membership rules as authority for collection; (3) referenced suspension in union membership; (4) threatened no other adverse

consequence of non-payment; and (5) the October 2013 letter makes clear that union knew the protesting employees were core members with no obligation to pay full union dues.

The Board is, of course, right that the factors it identified provided good reason to believe that Local 5 aimed to extract "full" membership dues, but hardly anything tipped off core employees that the Union did so *by mistake* and that the demanded payment and promised garnishment were not to be taken seriously. That is where the Board's rationale comes up woefully short. Indeed, the Dues Letter's terms make it just as (if not more) likely that Local 5 hoped to obtain—by garnishment or a pressured voluntary payment—the very dues it sought: full membership dues.

In addition, the fact that, just five months earlier in October 2013, Local 5 had solicited these same employees to switch from core to full membership undermines rather than supports the Board's decision. Because the Objecting Employees knew the Union's records fully documented their core status, it was eminently sensible for them to take the Dues Letter at face value as an effort to wring full membership dues out of them notwithstanding that the Union well knew their core-only status.

The proof is seemingly in the pudding in that Local 5 has never claimed that its letter was a mistake or apologized for it. Perhaps that is why the Board contorted itself to conclude that no reasonable employee would view the letter as anything but a mistake, while withholding judgment on whether the letter was, in actuality, sent by mistake. Surely it is reasonable for the Objecting Employees to have been as confused about the Letter's intent as the Board seemed to be.

Finally, the Board is wrong that the Dues Letter did not

warn of any adverse consequence beyond suspension. The Letter included a substantial second threat—actually, a promise—of garnishment that the Letter advised was already underway. And that garnishment actually happened. So whether coercion or restraint is measured from the vantage point of the employee receiving the Dues Letter or the employee receiving a smaller paycheck because the forewarned garnishment materialized two weeks later, the Objecting Employees' exercise of their right not to pay full dues was forcibly restrained by the Dues Letter and the garnishment it expressly set in motion.

The Board's effort to backhand the impact of the Dues Letter's garnishment threat ignores the significant practical consequences that docking a paycheck could inflict on the many wage earners who rely on their weekly income to make ends meet. In fact, the Board acknowledged at oral argument that the actual garnishment could be "a separate violation of the Act." Oral Arg. 21:05–21:16. Given that, the Board was obligated to factor the promise of forthcoming garnishment and the Letter's role in setting the actual garnishment process into motion in its analysis of coercion or restraint.

As for the Union, it argues that even a theft by union officials would fall outside the Act unless accompanied by a threat of termination. Oral Arg. 21:05–21:16. Thankfully, that is not the law.

\* \* \* \* \*

The Board has provided no rational basis for concluding that the Dues Letter's garnishment threat and the garnishment process it triggered did not "reasonably tend[] to restrain or coerce employees" in the exercise of their Section 7 right not

to pay full union membership dues. *Pomona Valley Hosp.*, 355 N.L.R.B. at 235; *Enterprise Leasing Co. of Florida*, 831 F.3d at 543. Nor could the Board plausibly conclude that no reasonable employee could construe the Dues Letter's multiple demands for an illegitimate payment, combined with a promise of forced withholding, as coercive. *Pomona Valley Hosp.*, 355 N.L.R.B. at 235.[2]

Accordingly, we grant the Objecting Employees' petition for review, vacate the Board's decision, and remand for further proceedings on the charge that the Local 5 engaged in unfair labor practices.

*So ordered.*

---

[2] The Board did not reach the question of proper remediation for Local 5's overreach, so that issue is not before us. It remains open for the Board to address on remand.