Opinion for the Court filed by Circuit Judge GRIFFITH.
Dissenting opinion filed by Circuit Judge HENDERSON.
GRIFFITH, Circuit Judge:
When the Kiewit Power Constructors Company warned its electricians that their morning and afternoon breaks were too long, two of them responded that things would “get ugly” if they were disciplined, and one said that the supervisor had “better bring [his] boxing gloves.” Each was fired. The National Labor Relations Board (NLRB) reinstated both workers, finding that in context their statements were not physical threats, but were merely figures of speech made in the course of a protected labor dispute. Because the NLRB’s findings are supported by substantial evidence, we deny Kiewit’s petition for review and grant the cross-application for enforcement.
I
Beginning in 2007, Kiewit worked as a subcontractor providing the design and construction of a turbine and related structures for a coal-fired power plant in Weston, Missouri. Represented by the International Brotherhood of Electrical Workers, the twenty-two electricians employed for the project entered into a collective bargaining agreement with Kiewit in 2008. The agreement provided for only a half-hour lunch break at noon, but Kiewit allowed an additional fifteen-minute break at 9:30 a.m. and another at 3:00 p.m.
The electricians typically took their breaks in a “dry shack,” a trailer outside the turbine budding that allowed them to remove their protective equipment, something they could not safely do inside the turbine building because of the danger from ash and falling objects. As construction progressed, the distance between the dry shack and the job sites increased, and the workers began leaving their jobs earlier so that they could spend a full fifteen minutes inside the dry shack. As a result, the morning and afternoon breaks stretched to between twenty-five and thirty minutes. In response, Kiewit announced that electricians were to take breaks in the turbine building rather than the dry shack — a practice called “breaking in place.” The union objected, and the electricians continued taking their breaks in the dry shack. Kiewit decided to issue individualized oral warnings to any electrician or foreman who violated the policy. Under the company’s rules, employees receive an oral warning for the first violation of a policy, a written warning for a second violation, and suspension or termination for a third violation.
Following the morning break on May 20, which the electricians took in the dry shack, Kiewit’s Field Superintendent, Kendall Watts, accompanied by union steward Mike Potter, visited each of the job sites to give the electricians the company’s oral warning. Potter told the electricians at each job site that neither he nor the union agreed with the policy. When Watts and Potter came to where Brian Judd and William Bond were working, another elec *25 trician asked them if employees would receive a written warning if they took their breaks in the dry shack that afternoon. Watts answered yes. Judd responded that he had “been out of work for a year,” and that if he got “laid off it’s going to get ugly and [Watts] better bring [his] boxing gloves.” Kiewit Power Constructors Co. & Brian Judd, 355 N.L.R.B. No. 150, 2010 WL 3406467, at *15 (2010). Bond also told Watts that he had recently been out of work for eight months and repeated Judd’s comment that “it’s going to get ugly.” Id. Watts did not respond.
Potter and Watts moved on to the other job sites and delivered warning notices to the remaining electricians. Watts then told his supervisor, Roger Holmes, about what Judd and Bond had said, which he called a physical threat. Later that afternoon, Holmes met with his supervisor, Ken Gibson, as well as two managers on the site. All agreed that Judd and Bond should be fired for violating the company’s zero-tolerance policy towards workplace violence. The next day, Judd and Bond were summoned to the managers’ trailer, where Gibson and Holmes fired them. Judd and Bond pled for their jobs, claiming they had only told Watts that there would be consequences for enforcing a policy against breaking in place. Later that morning, Kiewit agreed to create a shelter in the turbine building where the electricians could break in place and shed their protective gear, and rescinded reprimands for all the electricians except Judd and Bond.
An administrative law judge upheld their dismissal, concluding that their words were threats of physical violence. The NLRB reversed on the ground that their words were only figures of speech made in the course of activity protected by the National Labor Relations Act (NLRA). The NLRB ordered Kiewit to reinstate Judd and Bond, compensate them for lost earnings, remove from its files any reference to the discharges, and to not otherwise hold the incident against them. Two weeks later, Kiewit filed a petition for review in this court. We take jurisdiction pursuant to 29 U.S.C. § 160(e) — (f).
II
“The courts accord a very high degree of deference to administrative adjudications by the NLRB. When the NLRB concludes that [a] violation of the NLRA has occurred, that finding is upheld unless it ‘has no rational basis’ or is ‘unsupported by substantial evidence.’ ” United Steelworkers of Am. v. NLRB, 983 F.2d 240, 244 (D.C.Cir.1993) (quoting United Mine Workers of Am., Dist. 31 v. NLRB, 879 F.2d 939, 942 (D.C.Cir.1989)). “It is not necessary that we agree that the Board reached the best outcome in order to sustain its decisions. The Board’s findings of fact are conclusive when supported by substantial evidence on the record considered as a whole.” Id. at 244 (D.C.Cir.1993) (quoting 29 U.S.C. § 160(e)). As we have noted, the Supreme Court has instructed that “a decision of an agency such as the Board is to be reversed only when the record is ‘so compelling that no reasonable factfinder could fail to find’ to the contrary.” Id. (quoting INS v. Elias-Zacarias, 502 U.S. 478, 484, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)).
Moreover, “[w]here the Board has disagreed with the ALJ, as occurred here, the standard of review with respect to the substantiality of the evidence does not change.” Local 702, Int’l Bhd. of Elec. Workers v. NLRB, 215 F.3d 11, 15 (D.C.Cir.2000) (internal quotation marks omitted); see Universal Camera Corp. v. NLRB, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (holding that “[t]he ‘substantial evidence’ standard is not modified *26 in any way when the Board and its examiner disagree”). “[C]ases have made clear that [t]he findings and decision of the [ALJ] form an important part of the record on which [the] judgment of substantiality is to be based, and that the Board, when it disagrees with the ALJ, must make clear the basis of its disagreement.” Local 702, 215 F.3d at 15 (internal quotations marks omitted). “In the end, however, ‘[s]ince the Board is the agency entrusted by Congress with the responsibility for making findings under the statute, it is not precluded from reaching a result contrary to that of the [ALJ] when there is substantial evidence in support of each result, and is free to substitute its judgment for the [ALJ]’s.’ ” Id. (internal quotation marks omitted).
The parties agree that Judd and Bond could not lawfully be terminated for merely complaining about Kiewit’s break policy and how it was enforced. Disputing such a condition of employment, Kiewit concedes, is protected by the NLRA. See NLRA § 7, 29 U.S.C. § 157 (2006) (protecting the right of employees to “self-organiz[e] ... to bargain collectively ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection”). But “an employee who is engaged in [protected] activity can, by opprobrious conduct, lose the protection of the Act.” Felix Indus., Inc. v. NLRB, 251 F.3d 1051, 1053 (D.C.Cir.2001). Although “employees are permitted some leeway for impulsive behavior when engaging in concerted activity, this leeway is balanced against an employer’s right to maintain order and respect” in the workplace. Piper Realty Co., 313 N.L.R.B. 1289, 1290 (1994). When deciding whether the employee’s otherwise-protected complaint about workplace policies tipped the balance and forfeited the protection of the Act, the NLRB considers four factors: “(1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee’s outburst; and (4) whether the outburst was, in any way, provoked by an employer’s unfair labor practice.” Atl. Steel Co., 245 N.L.R.B. 814, 816 (1979).
On appeal, the parties agree that the subject matter of what Judd and Bond said cuts in favor of protection and that their outburst was not provoked by any unfair labor practice on the part of Kiewit. Kiewit argues, however, that the NLRB abused its discretion by finding that the other factors — the place and nature of the outburst — did not work against the employees and in favor of the company.
A
Relying on Felix Industries, Kiewit argues that the location of a confrontation only favors protection for the employee when it occurs in a place that is designated for lodging complaints, such as a “formal grievance setting.” 251 F.3d at 1054. But that is not what we held in Felix Industries. There, an employee called his employer at work and berated him with obscenities. Id. Although we noted that a formal grievance process would surely be an appropriate setting for employee complaints, id., we did not restrict employees to registering complaints through any particular channel.
In this case, the NLRB held that it was reasonable for Judd and Bond to object to enforcement of the new break policy when and where it was announced to them, lest their fellow workers think they consented to the change. Kiewit issued the employees their individualized warnings on the job site in front of other workers, knowing that the electricians opposed the new policy. As the NLRB points out, it has consistently held that while quarrels with *27 management are more likely to disturb the workplace if they are made in front of fellow workers, the NLRB will not hold this against the employee when the company picks a public scene for what is likely to lead to a quarrel. See NLRB v. Sw. Bell Tel. Co., 694 F.2d 974, 978 (5th Cir.1982) (“Having chosen to argue in front of the other workers, the [c]ompany can hardly be heard to complain about the public nature of the ... discussion.”); Brunswick Food & Drug, 284 N.L.R.B. 663, 664-65 (1987), enforced mem. sub nom. NLRB v. Kroger Co., 859 F.2d 927 (11th Cir.1988).
The NLRB’s conclusion — that it was reasonable in this case for employees to respond briefly, spontaneously, and verbally to the disciplinary measure when and where it was announced — is not arbitrary or capricious. As such, we cannot disturb the NLRB’s conclusion that the “place” factor does not undermine Judd and Bond’s claim that their conduct was protected.
B
Kiewit also challenges the NLRB’s conclusion that the nature of the employees’ outburst did not remove them from the Act’s protection. Kiewit’s argument starts with the undisputed proposition that employers must be allowed to maintain rules prohibiting harassment and abusive or threatening language. See Adtranz ABB Daimler-Benz Transp., N.A., Inc. v. NLRB, 253 F.3d 19, 25-28 (D.C.Cir.2001) (confirming common sense on that issue). Kiewit argues that the NLRB’s decision in effect sanctions threats of violence in the workplace, and points out that we have flatly rejected the proposition that employees can only be dismissed for “flagrant, violent, or extreme behavior.” Aroostook Cnty. Reg’l Ophthalmology Ctr. v. NLRB, 81 F.3d 209, 215 n. 5 (D.C.Cir.1996). We have held that “denouncing a supervisor in obscene, personally-denigrating, or insubordinate terms ... properly counts against according [the employee] the protection of the Act.” Felix Indus., 251 F.3d at 1055 (employee called boss at work to inquire about pay, but ended up insulting him with a string of obscenities). Under our case law, Kiewit concludes, any physical threat against the employer cuts in favor of removing the worker from the protection of the Act.
We have no issue with that recitation of the law. The question, however, is not whether the outburst was something to be encouraged — no outburst is — but whether it was so unreasonable as to warrant denying protections that the Act would otherwise afford.[1] As the NLRB itself has framed the issue, “when an employee is discharged for conduct that is part of the res gestae of protected concerted activities, the relevant question is whether the conduct is so egregious as to take it outside the protection of the Act, or of such a character as to render the employee unfit for further service.” Consumers Power Co., 282 N.L.R.B. 130, 132 (1986) (footnote omitted); see also NLRB v. Ben Pekin Corp., 452 F.2d 205, 207 (7th Cir.1971) (“[N]ot every impropriety committed during [section 7] activity places *28 the employee beyond the protective shield of the Act and the employee’s right to engage in concerted activity may permit some leeway for impulsive behavior.” (internal quotation marks omitted)). And, as we have stated before, that only happens when the employee’s actions are not simply bad, but “opprobrious.” Felix Indus., 251 F.3d at 1053.
In determining which actions are “opprobrious” and thus count against protecting the employee, we defer to the NLRB’s distinction between merely intemperate remarks, which the Act protects, and actual threats, which it does not. See Fairfax Hosp., 310 N.L.R.B. 299, 300 (1993) (employee’s statement that her supervisor should expect “retaliation” as a result of a new rule was “inherently ambiguous” and thus not so egregious as to lose the Act’s protection); Leasco, Inc., 289 N.L.R.B. 549, 552 (1988) (employee who told his supervisor that he was going to “kick [his] ass” was using “a colloquialism that standing alone does not convey a threat of actual physical harm”); Vought Corp., 273 N.L.R.B. 1290, 1295 (1984) (where an employee told his supervisor “I’ll have your ass,” the NLRB found that in context the statement was no more than a threat to file a grievance or report the supervisor to higher management), enforced, 788 F.2d 1378 (8th Cir.1986).
The question, then, is one of fact: did Judd and Bond physically threaten their supervisor? If they did, it counts against them and the NLRB was mistaken. If they did not, the NLRB was reasonable to conclude that the workers were still protected by the Act. And on this factual determination we must defer to the NLRB’s answer if supported by substantial evidence, 29 U.S.C. § 160(e), even if we would “have made a different choice had the matter been before [us] de novo,” Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We think the NLRB was not unreasonable in concluding that the electricians’ statements were not physically threatening.
To state the obvious, no one thought that Judd and Bond were literally challenging their supervisor to a boxing match. Once we acknowledge that the employees were speaking in metaphor, the NLRB’s interpretation is not unreasonable. It is not at all uncommon to speak of verbal sparring, knock-down arguments, shots below the belt, taking the gloves off, or to use other pugilistic argot without meaning actual fisticuffs. What these words stand for, of course, is a matter of context. Compare, e.g., http://www.youtube.com/ watch?v=3NklthJ7foI (last visited July 6, 2011) (the Capitals’ Alex Ovechkin literally dropping gloves to fight the Rangers’ Brandon Dubinsky), with http://www. youtube.com/watch?v=lxMgbhl2DAk (last visited July 6, 2011) (describing Vice Presidential candidate Sarah Palin as promising that the “gloves are coming off’ in the 2008 election), and Jonathan Weisman, Obama’s Gloves Are Off — And May Need to Stay Off, Wash. Post, Apr. 23, 2008, at Al. Indeed, such metaphors are part and parcel of competitive spirit. See http:// www.youtube.com/watch7v=R6mqFMdh De4 (describing college basketball phenom Jimmer Fredette as “destroying]” an opponent with his combination of long-range proficiency and acrobatic drives).
The NLRB examined the record here and determined that the “single, brief, and spontaneous reactions by” Judd and Bond were not physical threats, but only expressed vocal resistance to a policy they thought was unfair and unsafe. Kiewit Power Constructors Co., 355 N.L.R.B. No. 150, at *3. The absence of any physical gestures or other reasons to think Judd and Bond were threatening actual violence *29 supports that view.[2] Given our narrow standard of review, we have no warrant for reversing the NLRB’s determination that Judd and Bond were doing nothing more than disagreeing vehemently with Kiewit’s policy.
We agree, of course, with our dissenting colleague that the NLRA does not shield “vitriol[ic]” or “obscene insubordination” simply because it is unaccompanied by physical threats. Dissenting Op. 32-33 (quoting Felix Indus., 251 F.3d at 1055). But Kiewit did not contend that the employees’ words were unprotected because they were vitriolic or obscene (which they were not); it claimed they were unprotected because they constituted threats of physical violence. The Board did not hold that threats of physical violence are insufficient to violate the Act; only that in context the employees’ words were not physical threats. Nor did the Board hold that the employees’ words were shielded because they were unaccompanied by physical gestures; only that the absence of such gestures confirmed that Judd and Bond were not making physical threats.
To be sure, Judd and Bond’s statements were intemperate, but they did not involve the kind of insubordination that requires withdrawing the Act’s protection. It would defeat section 7 if workers could be lawfully discharged every time they threatened to “fight” for better working conditions. See Sw. Bell Tel. Co., 694 F.2d at 978 (upholding NLRB’s determination that employee’s repeated statement — “I’m going to see that [expletive] fry” — was “at most ... ambiguous,” and reasoning that “however sympathetic we might be to the Company’s plight, we simply cannot adopt the Company’s arguments [that the comments were so extreme that they necessarily fall outside the Act’s protection] because our review is restricted to the substantial evidence test”); Vought Corp., 273 N.L.R.B. at 1295 (employee’s statement to supervisor that “I’ll have your ass” was no more than a threat to file a grievance or to report the supervisor to higher management), enforced, 788 F.2d 1378 (8th Cir.1986).
Ill
For the foregoing reasons, we deny the petition for review and grant the cross-application for enforcement.

So ordered.

. That is not to say, however, that every time an employee’s outburst crosses this line, the NLRB must conclude that the employee's otherwise-protected activity is lawfully exposed to discipline. There are still other Atlantic Steel factors to consider. It is possible for an employee to have an outburst weigh against him yet still retain protection because the other three factors weigh heavily in his favor. Cf. Felix Indus., 251 F.3d at 1055 ("Under the applicable precedents [obscene and personally denigrating] statements do weigh against protection. Whether they weigh enough to tip the balance in that direction is for the Board to decide on remand.”).

. The dissent seems to suggest that an employer's subjective perception of an employee's statement is dispositive. See Dissenting Op. 34-35 (noting that "Watts testified that he felt threatened”); id. at 35 (describing “how the words were perceived”). On this basis, the dissent characterizes the NLRB as disregarding the ALJ’s credibility determination. See id. But the NLRB did no such thing. It merely held that the comments were objectively not a threat. And that is consistent with how the NLRB has read the Act in past cases. See Shell Oil Co., 226 N.L.R.B. 1193, 1196 (1976) (upholding ALJ finding that the subjective perception of a supervisor, although taken into account, is not dispositive on whether an employee loses the protection of the Act), enforced, 561 F.2d 1196 (5th Cir.1977). It was not arbitrary or capricious for the NLRB to determine whether the remarks were threatening using an objective standard rather than relying solely or primarily on the subjective perceptions of Watts.