# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 21, 2025          Decided July 1, 2025

No. 24-1218

THOMAS HENRY MCLAMB,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

On Petition for Review of an Order
of the National Labor Relations Board

*Alyssa K. Hazelwood* argued the cause for petitioner. With her on the brief was *Glenn M. Taubman*.

*Gregoire F. Sauter*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Jennifer A. Abruzzo*, General Counsel, *Ruth E. Burdick*, Deputy Associate General Counsel, and *Usha Dheenan*, Supervisory Attorney.

Before: HENDERSON, WALKER and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* WALKER.

KAREN LECRAFT HENDERSON, *Circuit Judge*:  This case arises from a heated confrontation that occurred during a union election campaign.  The Amalgamated Transit Union Local 689 (Union) represents employees of a transportation services company, Transdev Services Inc. (TransDev).  In November 2021, petitioner Thomas McLamb was running as an anti-incumbent candidate to be a union official.  While campaigning, he made several inflammatory comments to an incumbent Union official, Tiyaka Boone, who interpreted his remarks as personal attacks.  The argument escalated, culminating in a physical altercation in which Boone struck McLamb.  Afterward, another Union official, Alma Williams, made a statement to a manager allegedly suggesting that if Transdev terminated Boone it should also terminate McLamb.

McLamb brought unfair labor practice charges against the Union before the National Labor Relations Board (NLRB or Board).  He contended that the Union had violated the National Labor Relations Act because Boone's conduct was in response to his protected union activities and that Williams had violated the duty of fair representation as a union official.  The Board dismissed McLamb's charges, finding that a reasonable employee would believe that Boone was motivated by personal animosity, not retaliation for protected activities, and Williams' comment was to ask for leniency for Boone, not punishment for McLamb.  McLamb has petitioned this Court for review.  We deny the petition because substantial evidence supports both conclusions.

# I. Background

## A. Statutory Background

The National Labor Relations Act (Act), codified at 29 U.S.C. § 151 *et seq.*, establishes employees' rights to self-organize, form, join or assist labor organizations and to engage in collective bargaining or other concerted activities for mutual aid or protection. Section 7 of the Act protects the right of employees to engage in, or refrain from, any union-related activities, with certain exceptions not relevant here. *Id.* § 157; *see also Weigand v. NLRB*, 783 F.3d 889, 892 (D.C. Cir. 2015).

Section 8(b)(1)(A) of the Act makes it an unfair labor practice for a labor organization or its agents to restrain or coerce employees in the exercise of their section 7 rights. 29 U.S.C. § 158(b)(1)(A). Section 8(b)(2) prohibits labor organizations from causing or attempting to cause an employer to discriminate against an employee in order to encourage or discourage union membership. *Id.* § 158(b)(2); *see also id.* § 158(a)(3).

## B. Factual Background

Transdev Services, Inc. provides transportation services in Maryland, Virginia and the District of Columbia. Transdev's drivers are represented by Amalgamated Transit Union (ATU), Local 689, affiliated with Amalgamated Transit Union, AFL–CIO, CLC, which local assumed its representational duties in 2021 following a merger with ATU Local 1764.

Petitioner Thomas Henry McLamb is a longtime dissident Union member, whose opposition to Union leadership spanned nearly a decade before this suit. In 2014, he filed a decertification petition—seeking to remove the Union's representation—which failed in an employee vote. He also

became a fee objector, which allowed him to withhold union dues used for activities beyond collective bargaining. *See Commc'ns Workers of Am. v. Beck*, 487 U.S. 735 (1988). McLamb filed petitions to de-authorize Union security provisions in 2016 and 2018, both of which failed. These efforts allegedly created a longstanding adversarial relationship between McLamb and Union leadership.

At the time of the altercation, McLamb was campaigning for election as a shop steward and executive board member as part of an anti-incumbent slate, "the People's Voice." McLamb opposed Union officers, including Michelle Woodfork, Alma Williams and Tiyaka Boone, all of whom supported Union President Raymond Jackson.

On November 11, 2021, McLamb arrived early at Transdev's facility in Hyattsville, Maryland, to campaign in the operators' lounge by distributing flyers and speaking with colleagues. Several other employees, including shop steward Tiyaka Boone, were present. Boone, although not a candidate herself, was campaigning for Woodfork and Williams, who were running as part of the incumbent slate.

The details of what happened next are disputed. McLamb began to make loud comments to the assembled employees, including accusations that the Union had embezzled funds. He implied that he would expose certain improprieties at a meeting where he would "let it all out." R. 520. McLamb also made pointed comments about Maryland residents using Virginia license plates on their vehicles to evade higher costs associated with Maryland registration and insurance. Boone lived in Maryland but had Virginia plates. McLamb "made repeated statements about unnamed people not paying their bills." *Id.* Boone's husband had recently died and she had been forced to raise money to pay for funeral expenses. R. 520-21. McLamb

also said "some people need to focus on their kids rather than the union." *Id.* Only a few days earlier, Boone's son had narrowly survived a stabbing. Boone understood each of McLamb's comments to be allusions to her specific hardships; McLamb denied any knowledge of them.

The confrontation escalated. Boone faced McLamb, telling him—with some profanity—to leave her alone and to stop talking about her personal issues. Another employee tried to intervene but Boone and McLamb continued to argue. That employee escorted McLamb out of the lounge. Boone followed shortly thereafter.

Seeing McLamb again, Boone approached him, yelling at him and pushing another employee standing between them. As she struggled with an employee blocking her from McLamb, Boone managed to strike McLamb in the face, knocking his glasses to the ground. Two Transdev employees, including Alma Williams, escorted Boone from the scene. The entire outdoor incident was captured on Transdev's surveillance camera. *See* NLRB Gen. Counsel's Ex. 17.

Later the same day, Boone and Williams, the latter acting as Boone's union representative, met with Conrad Marshall, Transdev's general manager, to discuss the incident. Marshall told Boone that assaulting another employee was a terminable offense. Williams responded that disparaging coworkers was also prohibited conduct and said that if Transdev fired Boone, it should also fire McLamb. Three days later, Williams submitted a statement about the incident that downplayed Boone's responses to McLamb's offensive comments.

A week after the incident, on November 18, Transdev issued McLamb a ten-day suspension for making inappropriate remarks and creating a hostile work environment. On December 3, Transdev fired Boone for striking McLamb. Both

employees filed grievances over their punishments, which the Union submitted to Transdev. After Transdev denied the grievances, both were taken to arbitration. McLamb eventually settled with Transdev, which retracted his suspension and provided him backpay for the days he had not worked.

## C. Procedural Background

McLamb filed unfair labor practice charges with the National Labor Relations Board. He asserted that the Union violated (1) section 8(b)(1)(A) of the NLRA by virtue of Boone's physical assault, which allegedly restrained or coerced him in the exercise of his section 7 rights; and (2) section 8(b)(2) through Williams' alleged efforts to see him terminated.[1] The NLRB General Counsel issued a complaint including both allegations. After a hearing, an administrative law judge (ALJ) dismissed the section 8(b)(1)(A) charge, finding that Boone's actions were motivated by personal animus, not by McLamb's protected activity. The ALJ also determined, however, that Williams' comments to Transdev constituted a violation of section 8(b)(2), concluding that the statements sought McLamb's termination in retaliation for his union-related activity.

On review, the NLRB affirmed the ALJ's first finding but reversed the second. Regarding the first charge, the Board determined that employees would have understood Boone's conduct to be a reaction to McLamb's personal attacks, not union activity, and thus her actions had no reasonable tendency to restrain or coerce McLamb's exercise of section 7 rights.

---

[1] McLamb also filed a charge against Transdev but retracted it as part of his settlement agreement.

As to the second charge, the Board determined that Williams, in her capacity as a Union representative, had not sought McLamb's discharge.  It concluded that Williams' statement was conditional ("*if* Boone were discharged . . .") made while seeking leniency for Boone.  The Board noted that "there was no request, express or implied, that McLamb be discharged" and "Williams was no more seeking McLamb's termination than she was seeking Boone's."  *Amalgamated Transit Union, Loc. 689*, 373 N.L.R.B. No. 49, 2024 WL 1878189, at \*5 (Apr. 26, 2024).  It added that, even if Williams had sought McLamb's discharge, the Union itself would not have acted unlawfully because it did not breach the duty of fair representation nor act from an impermissible motive.  One member of the Board dissented from the section 8(b)(2) decision because he believed Williams' comments were intended to secure McLamb's discharge.

McLamb timely petitioned this Court for review.  The Board had jurisdiction under 29 U.S.C. § 160(a) and we have jurisdiction under 29 U.S.C. § 160(f).

## II.  Analysis

### A.  Standard of Review

"Judicial review of the Board's decisions and orders must evaluate both the Board's statements of law and application of law to the facts."  *Circus Circus Casinos v. NLRB*, 961 F.3d 469, 475 (D.C. Cir. 2020).  At the same time, we "review Board decisions with a very high degree of deference."  *Hosp. de la Concepción v. NLRB*, 106 F.4th 69, 76 (D.C. Cir. 2024) (quotation omitted).  "We will uphold a decision of the Board unless it relied upon findings that are not supported by substantial evidence, failed to apply the proper legal standard, or departed from its precedent without providing a reasoned justification for doing so."  *Int'l Longshore & Warehouse*

*Union v. NLRB*, 890 F.3d 1100, 1107 (D.C. Cir. 2018) (quoting *E.I. Du Pont De Nemours & Co. v. NLRB*, 682 F.3d 65, 67 (D.C. Cir. 2012)). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quotation omitted).

We give "substantial deference to inferences drawn by the Board from the factual record." *Tenneco Auto., Inc. v. NLRB*, 716 F.3d 640, 647 (D.C. Cir. 2013) (quotation omitted). The Board's credibility determinations are accepted unless they are "hopelessly incredible, self-contradictory, or patently unsupportable." *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 349 (D.C. Cir. 2011) (quotation omitted). We "may not displace the Board's choice between two fairly conflicting views, even though we would justifiably have made a different choice had the matter been before us *de novo*." *Bob's Tire Co. v. NLRB*, 980 F.3d 147, 153 (D.C. Cir. 2020) (quoting *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 306 (D.C. Cir. 2003)). But substantial-evidence review must also account for anything in the record that "fairly detracts from its weight." *Universal Camera*, 340 U.S. at 488.

In a case like this one, where the Board and ALJ reach different conclusions, the U.S. Supreme Court has instructed that "[t]he 'substantial evidence' standard is not modified in any way." *Id.* at 496. The ALJ's findings and written decision are simply part of the record that the reviewing court must consider in determining whether the Board's decision is supported by substantial evidence. *Id.* at 493. That said, Board "determinations 'are vulnerable if they fail to reflect attentive consideration to' the ALJ's finding of fact." *Mathew Enter., Inc. v. NLRB*, 498 F. App'x 45, 46 (D.C. Cir. 2012) (quoting *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 853 (D.C. Cir. 1970)); *see also Universal Camera*, 340 U.S. at 496 ("[A]

conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's . . . .").

## B. The Section 8(b)(1)(A) Charge

McLamb first challenges the Board's conclusion that Boone did not violate section 8(b)(1)(A) because any reasonable employee would have understood her actions to be motivated by his insulting behavior rather than any union-related activities. He argues that the Board lacked a sufficient factual basis to conclude that he had in fact been personally insulting. Pet. Br. 21-29. And, even if he were insulting, he asserts that the Board ignored its precedent by concluding that Boone's conduct did not violate section 8(b)(1)(A). *Id.* at 29-38. Neither argument has merit.

In analyzing an alleged section 8(b)(1)(A) violation, the Board "applies an objective standard that focuses on whether the union conduct would have a reasonable tendency to restrain or coerce employees in the exercise of their Section 7 rights." *Graphic Commc'ns Conf.–Teamsters Loc. 735-S*, 369 N.L.R.B. No. 97, 2020 WL 3048007, at *9 (June 5, 2020) (*Bemis*). It "is an objective test, and neither the speaker's subjective intent nor the employee's subjective reaction is relevant." *Nat'l Rural Letter Carriers Ass'n*, 372 N.L.R.B. No. 52, 2023 WL 2016436, at *2 (Feb. 13, 2023) (citing *Consol. Bus Transit*, 350 N.L.R.B. 1064 (2007)); *see also Teamsters Loc. 162 (American Steel, Inc.)*, 255 N.L.R.B. 1230, 1233 (1981) ("[T]he test is an objective, rather than a subjective, one and depends on whether, in the circumstances of a given case, the probable effect of the conduct is to restrain or coerce an employee in the exercise of his Section 7

rights.").[2]  In other words, the test asks whether, objectively, a reasonable employee would have understood the union representative's conduct to restrain or coerce him in the exercise of his section 7 rights.  *Id.*

The Board found that McLamb failed to clear that bar because no reasonable employee would have understood Boone's actions as being related to his union activities.  373 N.L.R.B. No. 49, at *3.  Instead, it determined that an employee would have understood Boone's conduct to be motivated by personal animosity stemming from McLamb's own antagonistic behavior toward her.  *Id.*  The Board reasoned that, because an objective employee "would have understood Boone's conduct as a reaction to McLamb's personal attacks, not his dissident union activity, . . . Boone's conduct would not have had a reasonable tendency to restrain or coerce [him] in the exercise of [his] Section 7 rights."  *Id.*  The Board also noted that, "[a]s a threshold matter, . . . it stretche[d] the imagination to consider the personal insults [McLamb] hurled at Boone . . . as protected activity."  *Id.* at *4.

Substantial evidence supports the Board's conclusion. Witnesses uniformly testified that Boone and McLamb had a personal disagreement, not one motivated by union activities. No witness testified that Boone sought to curb McLamb's election advocacy or prevent him from engaging in protected activity.  In addition to Boone and McLamb, the ALJ heard testimony from five other Transdev employees—Laco King,

---

[2] The parties do not contest that the objective standard is applicable to McLamb's claim.  Whether that standard is the correct one is not before us and there is thus no reason to decide it.  *Cf. Tamosiunas v. NLRB*, 892 F.3d 422, 430 n.1 (D.C. Cir. 2018) (taking no position on "whether the Board's 'any reasonable employee' framework provides the proper lens through which to view a Section 8 violation").

Tandaleyia Butler, Brenard Bolling, Michelle Smith and Valerie Thomas—all of whom witnessed the exchange between Boone and McLamb. Their accounts described a personal dispute, not one centered on union activity. The ALJ also credited Boone's testimony that McLamb's remarks were directed at her and discredited McLamb's contrary account. R. 520 n.3, 521 n.4.

King testified that McLamb specifically addressed Boone, making comments about her Virginia license plates and financial difficulties, and that Boone appeared to take the remarks personally. R. 315-16, 321-22. He understood the dispute as between Boone and McLamb, not as union-related. R. 321-22. King confirmed that McLamb never mentioned the Union and that no one had attempted to prevent him from distributing flyers or speaking about it. R. 316-18. The ALJ found King's testimony especially credible. R. 520 n.2, n.3.

Butler's testimony aligned with King's. She recalled that McLamb repeatedly addressed Boone by name, making remarks about her Virginia tags and referencing her staying home with her children. R. 208.[3] Boone, for her part, appeared confused as to why McLamb was "bothering her," as she was not a candidate. *Id.* Butler confirmed that Boone had not interfered with McLamb's electioneering. *Id.* Smith likewise recalled Boone telling McLamb, "Leave me alone. Don't

---

[3] McLamb argues that the Board erred by relying on Butler's testimony for the proposition that he addressed Boone by name because that testimony was not discussed by the ALJ. *See* Pet. Br. 22-23. He failed to preserve that challenge because he did not move for reconsideration of that finding. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665-66 (1982) (parties must file motion for reconsideration to preserve challenges to findings made by the Board in the first instance). McLamb has thus forfeited that argument.

worry about what I am doing. Don't worry about me paying my bills." R. 300. She also testified that Boone described McLamb as "harassing" her. R. 302-03.

Thomas testified that she had not heard McLamb refer to the Union at all but that he seemed to be making inexplicable remarks about license plates and insurance. R. 285-86. She added that McLamb "wasn't campaigning when he was . . . talking about insurance and cars" and that she "never heard anything . . . based on the campaign." R. 291. The ALJ found Thomas, like King, credible. R. 520 n.3.

McLamb argues that, as a factual matter, the Board erred in finding that he was personally insulting Boone or was making comments implicating Boone's husband and child. Pet. Br. 19-25. At least one credible witness—Butler—testified that she heard McLamb mention Boone's child and that he had directed his comments toward her personally. R. 208. But more importantly, the Board's decision did not rest on the fact that McLamb had used any specifically egregious insults. McLamb's exact language is irrelevant to the analysis, which asks only whether an objective employee would have understood Boone's reactions to be related to McLamb's union activities. None of the witnesses' testimony supported such a conclusion.

McLamb also asserts that the Board improperly characterized or inferred that his statements were "egregious insults," despite there being no evidence that he intended to be insulting or knew about Boone's particular circumstances. It does not matter what McLamb intended by his comments, nor even what the specifics of those comments were. The Board had the benefit of multiple witnesses, most of whom had little or no relationship with either Boone or McLamb and none of whom understood any of Boone's action to have been

motivated by anything except personal feelings. In other words, there was sufficient evidence that an objective employee would not have understood Boone's conduct to be in response to McLamb's union activities.

McLamb argues further that the Board incorrectly found that he had lost the Act's protections due to his purported insults because NLRB precedent establishes a much higher threshold for such behavior to lose protection. McLamb misreads both the Board's decision and its precedent. McLamb is correct as a general matter that if a dissident is engaged in section 7 activities, the NLRB has established a high bar for the circumstances in which his conduct might lose the Act's protections. *See HealthBridge Mgmt. v. NLRB*, 798 F.3d 1059, 1075 (D.C. Cir. 2015) ("[E]ven the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth, so long as the alleged offensive actions are directly related to activities protected by the Act and are not so egregious as to be considered indefensible."). Even so, as the Board explained, a condition precedent to that protection is a nexus or relationship between the conduct at issue and the protected activities. Without that nexus, as here, the behavior is not given the same protection.

McLamb relies on precedent that supports the distinction. In *Boilermakers Local 686*, for example, a local union president threatened a member who had resigned from the union and lied about soliciting employees to cross a picket line. 267 N.L.R.B. 1056, 1056 (1983). There, the Board determined that there was "an unmistakable nexus between [the president's] repeated comments about physical confrontation and the ongoing dispute with [the member's] protected concerted activities against the [u]nion." *Id.* at 1057. In another case, union dissidents engaged in a years-long feud with union leadership "characterized by vulgarities, insults,

and slurs," including accusations of child molestation. *Laborers' Int'l Union of N. Am., Loc. 806*, 295 N.L.R.B. 941, 958 (1989). But the Board determined there that, despite its "nettlesome" character, such insulting conduct did not remove it from the Act's protection because it was "intimately related to the focus of the dissident activities, [the union's] leadership." *Id.* Likewise, in *Kiewit Power Constructors Co. v. NLRB*, 652 F.3d 22 (D.C. Cir. 2011), this court upheld protection for employees who engaged in a heated argument with supervisors regarding their work assignments. *Id.* at 29. Although their conduct was confrontational, it remained rooted in a direct challenge to employment conditions and thus retained its character as protected activity. *Id.* In each of those cases, the conduct in question, however aggressive or offensive, was inextricably linked to workplace conditions or union activity. By contrast, McLamb's comments, which bore no relation to Union policies or collective concerns, lacked the requisite nexus to connect them to section 7.

Although not cited by McLamb, the Board decision in *Pier Sixty, LLC*, 362 N.L.R.B. 505 (2015), further illustrates the distinction. There, a group of catering employees sought union representation based on what they perceived to be mistreatment by management. *Id.* at 505. Two days before the union election, after an employee's unpleasant interaction with a supervisor—the same kind of complaint that sparked the unionization effort—the employee posted a profane Facebook message that ended in a clarion call to "Vote YES for the UNION!!!!!!!" *Id.* The employee was then discharged for violating a workplace-conduct policy. *Id.* at 506.

The Board first determined that the employee's comments were protected section 7 activity because they "were part of a sequence of events involving the employees' attempts to protest and ameliorate what they saw as rude and demeaning

treatment on the part of [the employer's] managers." *Id.* On review, the Second Circuit affirmed that the Board had reasonably found a nexus between the employee's post and protected union activity, in part because the "subject matter of the message included workplace concerns—management's allegedly disrespectful treatment of employees, and the upcoming union election." *See NLRB v. Pier Sixty, LLC*, 855 F.3d 115, 124 (2d Cir. 2017) (citation modified). The Board then found that the employee's language was not "so egregious as to exceed the Act's protection." 362 N.L.R.B. at 506.[4]

*Pier Sixty* illustrates the difference between the Board's approach and McLamb's misunderstanding. Here, unlike *Pier Sixty*, the Board reasonably concluded that McLamb was *not* engaged in section 7 activity when he made his comments about and to Boone. Notwithstanding McLamb was engaged in campaigning at the time of the incident, the substance of his remarks bore no relationship to the Union's institutional conduct or to the terms and conditions of employment generally. The ALJ found, and the Board affirmed, that McLamb's comments were specific to Boone's private life and unconnected to any broader union or workplace issue. That those comments were objectively understood to be personal attacks is corroborated both by multiple witnesses and by Boone's immediate reaction, which was not to contest union policy or campaign positions but to defend her private affairs. *See* R. 520-21.

---

[4] It is also worth noting that *Pier Sixty* was subsequently overruled by the Board before it decided this case. *See Gen. Motors LLC*, 369 N.L.R.B. No. 127 (July 21, 2020). The Board appears to be reassessing how it determines whether an employer's sanctioning of an employee is motivated by punishing protected activity or by a need for workplace discipline. *Compare id.*, *with Lion Elastomers LLC*, 372 N.L.R.B. No. 83 (May 1, 2023).

The timing of McLamb's remarks—although coincident with his campaign—does not suffice to bring them within the protection of section 7. The Act does not insulate all speech uttered during a union campaign; it protects only those expressions that relate to "concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. In *Pier Sixty*, the employee's profane exhortation explicitly advocated for union representation as a remedy to workplace mistreatment. *See* 362 N.L.R.B. at 506. McLamb's statements to Boone, by contrast, were not directed toward her union role (or that of the candidates she supported) nor sought to engage fellow employees in collective action regarding their working conditions. They were, as the Board found, personal insults detached from any recognized protected activity. Because the NLRB reasonably concluded that McLamb failed to meet the threshold requirement to show that he was engaged in protected activity, it had no reason—unlike the *Pier Sixty* circumstances—to consider whether the nature of those comments would nonetheless have vitiated that protection. *Cf. id.* at 506-08.

## C. The Section 8(b)(2) Charge

McLamb next contends that the Board erred in dismissing the section 8(b)(2) charge because, in his view, it based that decision on testimony discredited by the ALJ. As noted, section 8(b)(2) prohibits a labor organization from attempting to cause an employer to discriminate against an employee in violation of section 8(a)(3). 29 U.S.C. § 158(b)(2).

The NLRB evaluates alleged section 8(b)(2) violations under a two-step framework. The first step asks whether a union in fact caused or attempted to cause an employee to be disciplined or, as relevant here, discharged. *See Bemis*, 369 N.L.R.B. at *6. If that threshold is met, "there is a rebuttable

presumption that [the union] acted unlawfully." *Id.* At step two, a union may then rebut the presumption by showing that its actions were in fact lawful. *Id.* The Board uses a variety of methods to analyze the lawfulness of a union's conduct, including the duty of fair representation and *Wright Line* frameworks. *Id.* at *5.

Here, the Board determined that the section 8(b)(2) allegation failed at the first step because "there was no request, express or implied, that McLamb be discharged." 373 N.L.R.B. No. 49, at *5. Specifically, it determined that Williams' statement was conditional on its face and "made in the context of arguing against discipline for Boone," rather than for discipline of McLamb. *Id.* & n.13. "Williams' statement, therefore, was an attempt to raise the stakes for the employer in order to discourage Transdev from discharging Boone" and "Williams was no more seeking McLamb's termination than she was seeking Boone's." *Id.* It noted that, even if McLamb had shown that the Union's conduct was presumptively unlawful, the presumption would have been rebutted because there was neither a breach of the duty of fair representation nor an impermissible motivation under *Wright Line*. *Id.* at *5-6. Member Kaplan dissented, contending that the Board's conclusion rested on a "post-hoc rationalization" of Williams' comment that was inconsistent with the ALJ's finding that she acted in bad faith. *Id.* at *8. In his view, once Williams' motive was discredited, her statement could not reasonably be interpreted as a neutral appeal for parity in discipline but as an effort to prompt McLamb's discharge.

We disagree. Substantial evidence supported the finding that McLamb's claim failed at step one. Although McLamb is correct that direct evidence of a request for discharge is unnecessary, there must at least be "sufficient evidence to support a reasonable inference of a union request [for

discharge] or a union–employer understanding." *Bemis*, 369 N.L.R.B. at \*4. That showing was not met here. Even ignoring Williams' testimony *entirely*, it is undisputed that Williams phrased her comment as a conditional statement. *See* R. 166 (Boone confirming that Williams had made a conditional statement). It was that fact, and not Williams' discredited testimony, that the Board relied on in making its decision.

Moreover, beyond Williams' single conditional remark, the record is devoid of any evidence that suggests an intent to seek McLamb's discharge. Williams did not follow up on her comment, nor did she convey a request for discipline in more direct or urgent terms. No employer representative testified that he understood her to be urging McLamb's termination. Nor is there any documentary evidence reflecting that her statement influenced Transdev's disciplinary decision. The company simply imposed differing penalties—Boone was terminated and McLamb received only a suspension (later retracted). *See* R. 522.

Granted, the ALJ and one Board member drew a negative inference from Williams' statement based on her apparent bad faith but that result was not compelled by the precise language Williams used. The Board majority reasonably came to the opposite conclusion. Even if reasonable minds could differ, that fact alone does not justify setting aside the Board's decision. Because the Board's conclusion is supported by substantial evidence, we affirm. *See Tenneco*, 716 F.3d at 647.

And, assuming *arguendo* that Williams' statement could be construed as a request to fire McLamb, the Board did not act unreasonably in finding that the Union nonetheless did not violate its duty of fair representation.

The duty of fair representation is a judicially created doctrine which requires a union to represent its members

"honestly and in good faith and without invidious discrimination or arbitrary conduct." *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570 (1976). That duty is breached "only when a union's conduct toward a member . . . is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967); *Jacoby v. NLRB*, 325 F.3d 301, 305-06 (D.C. Cir. 2003).[5] It also "applies to all union activity." *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67 (1991). Where, as here, the union is alleged to have acted in bad faith, the petitioner faces a "demanding standard . . . requiring a union's actions toward unit employees to be sufficiently egregious or so intentionally misleading [as] to be invidious." *See Ruisi v. NLRB*, 856 F.3d 1031, 1038 (D.C. Cir. 2017) (alterations in original) (quoting *Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers v. NLRB*, 41 F.3d 1532, 1537 (D.C. Cir. 1994)).

Conversely, a union has not breached the duty if it can show that its actions were "done in good faith, based on rational considerations, and were linked in some way to its need effectively to represent its constituency as a whole." *Operative Plasterers & Cement Masons, Loc. 299*, 257 N.L.R.B. 1386, 1395 (1981). Accordingly, the "union may rebut the presumption that it acted unlawfully by demonstrating that its action 'was necessary to the effective performance of its function of representing its constituency.'" *Bemis*, 369

---

[5] As the Board noted, there is tension between the NLRB's use of the presumption of unlawfulness and the Supreme Court's understanding of the duty of fair representation as understood in *Vaca v. Sipes*, where a breach of the duty was held to occur "*only*" when a union's action is "arbitrary, discriminatory, or in bad faith." 386 U.S. at 190 (emphasis added); *see also* 373 N.L.R.B. No. 49, at *5 n.12 (noting that one Board member would be willing to revisit the use of the presumption in an appropriate future case). In any event, the issue is not before us.

N.L.R.B. at 97 (quoting *Operating Eng'rs Loc. 18*, 204 N.L.R.B. 681, 681 (1973)).

Here, the Board determined that—even assuming Williams's statement had been a request for McLamb's discharge—the Union met its burden to rebut the presumption of unlawfulness because it interpreted her actions as "act[ing] in good faith based on rational considerations in connection with representing the Union's constituency as a whole." 373 N.L.R.B. No. 49, at *5. It also determined that Williams' statement was "at the very most" "negligence in representation" or an "error of judgment." *Id.* at *6 (citing *Castello v. Douglas Aircraft Co.*, 752 F.2d 1480, 1482 (9th Cir. 1985) and *NLRB v. Local 139, Int'l Union of Operating Engineers*, 796 F.2d 985, 993 (7th Cir. 1986)). Although the ALJ and one Board member understood Williams' comment to have been made in bad faith, it was not unreasonable for the Board to infer that the comment was insufficiently "egregious" to amount to a breach of the duty. *Ruisi*, 856 F.3d at 1038-39.[6]

\* \* \*

For the foregoing reasons, the petition for review is denied.

*So ordered.*

---

[6] In light of our holding, we do not address the Board's subsidiary conclusions regarding the *Wright Line* framework.

WALKER, *Circuit Judge*, concurring in part and dissenting in part:

Even when a union member criticizes his union, the union must represent him fairly. This duty is required by the National Labor Relations Act. It is much like the duty an attorney owes a client.[1]

In this case, a union shop steward told an employer to fire a union member who had frequently criticized the Union. Because the union shop steward's betrayal of the union member violated the NLRA, I respectfully dissent.

# I

Thomas McLamb drives for a company that provides public transportation. The company's drivers are represented by the Amalgamated Transit Union. In McLamb's opinion, the Union wastes its members' money.

McLamb has not been shy about that opinion. He has tried to decertify the Union. He has petitioned twice to deauthorize it. He has opposed the merger of his union local with another. And he has campaigned for union office as part of a slate of dissidents.[2]

One morning during that campaign, in the drivers' lounge, McLamb once again accused the Union of mismanagement. He also insulted Tiyaka Boone, a union officer who supported McLamb's opponent in the election. Boone responded with a

---

[1] *See Air Line Pilots Association, International v. O'Neill*, 499 U.S. 65, 74-75 (1991).

[2] *See* Oral Arg. Tr. 31 (NLRB counsel: McLamb has been "a thorn in the union's side.").

threat: "I will fuck you up."[3] The situation escalated, and Boone hit McLamb in the face.

McLamb and Boone are two of the three employees relevant to this case. The third is Alma Williams. She was (1) a witness to the altercation between McLamb and Boone; (2) Boone's friend; (3) a union officer up for re-election on the slate opposed by McLamb; and (4) a union shop steward responsible for representing union members in trouble with their employer.[4]

After Boone's attack on McLamb, Boone met with the company's general manager. Williams accompanied Boone to that meeting in Williams' capacity as a union shop steward. When the general manager told Boone that hitting a co-worker is a terminable offense, Williams told the general manager that if Boone were fired, McLamb should be fired too. Williams argued that McLamb deserved "equal and fair punishment."[5]

Later, Williams sent the general manager a witness statement. With an emphasis on McLamb's "very personal and very offensive" insults toward Boone, Williams' statement portrayed McLamb as the episode's villain.[6] It praised Boone for "handling herself well," cast her as calmly asking McLamb

---

[3] R. 316.

[4] *See* What Is the Role of a Union Steward?, Society for Human Resource Management (Nov. 16, 2023), perma.cc/X2ZD-J2J6 ("when an employee is believed to have violated company policy . . . , the steward duties are to represent and defend rank-and-file employees in investigatory interviews . . . that are reasonably expected to result in disciplinary action"); *see also Air Line Pilots*, 499 U.S. at 74-75.

[5] R. 259.

[6] R. 419.

to "leave her alone," and conveniently omitted the most important part of the altercation — that Boone *hit* McLamb.[7]

In spite of Williams' advocacy for Boone, the company fired Boone and suspended McLamb. McLamb then filed an unfair labor practice charge against the Union before the National Labor Relations Board. McLamb claimed that when Williams (acting on the Union's behalf) encouraged the company to fire him, the Union violated the duty of fair representation required by the National Labor Relations Act.[8]

The administrative law judge agreed with McLamb on his fair-representation claim. But a divided Board disagreed, reversing the ALJ and dismissing McLamb's complaint. McLamb petitioned for review.

## II

The National Labor Relations Act prohibits unions from "caus[ing] or attempt[ing] to cause an employer to discriminate against an employee," 29 U.S.C. § 158(b)(2), "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization," *id.* § 158(a)(3). The Supreme Court has interpreted that prohibition to impose a "statutory duty of fair representation."[9] The duty requires a union "to serve the interests of all members without hostility or discrimination

---

[7] *Id.*

[8] In a settlement with the Board, the company reversed McLamb's ten-day suspension.

[9] *Vaca v. Sipes*, 386 U.S. 171, 177 (1967).

toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."[10]

To enforce this rule, the National Labor Relations Board has devised a two-step framework. At step one, the Board asks whether the union attempted to cause an employer to discipline an employee; if the union did, the union presumptively violated the NLRA.[11] At step two, the union can try to rebut this presumption; to succeed, the union must show that it acted "in good faith, based on rational considerations," connected "in some way to its need effectively to represent its constituency as a whole."[12]

Here, the Board concluded that McLamb's claim failed at both steps. *First*, the Board found that Williams' statement — that if Boone were fired, McLamb should also be fired — did not actually urge the company to punish McLamb because the statement was merely "conditional."[13] *Second*, the Board found that Williams acted in good faith because her statement was designed to save Boone's job, not to get McLamb fired.[14] According to the Board, Williams merely "raised the stakes for" the company by "pointing out the possibility that [the company] would have to decide whether to discharge two employees rather than one."[15]

---

[10] *Id.*

[11] *Graphic Communications Conference – Teamsters Local Union No. 735-S*, 369 NLRB No. 97, 2020 WL 3048007, at *6 (June 5, 2020).

[12] *Operative Plasterers & Cement Masons, Local No. 299*, 257 NLRB 1386, 1395 (1981).

[13] R. 595.

[14] *Id.*

[15] *Id.*

We review the Board's factual findings for "substantial evidence on the record considered as a whole."[16] Evidence is substantial when "a reasonable mind might accept [it] as adequate to support a conclusion."[17] Our review is deferential, but it is no "rubber stamp."[18] We cannot ignore "whatever in the record fairly detracts from" the "weight" of the evidence supporting the Board's decision.[19] And Board decisions displaying a "lack of evenhandedness" must be set aside.[20]

## III

The Board lacked substantial evidence for its decision.

## A

At step one, the Board concluded that Williams' statement was merely *conditional*, not a request to punish McLamb. It relied on Williams' if-then phrasing — if Boone were fired, then McLamb should be fired too. But substantial evidence does not support the Board's conclusion.

Consider the context that existed before and after Williams and Boone met with the general manager. Williams' relationships with Boone and McLamb, and her "course of

---

[16] 29 U.S.C. § 160(f).

[17] *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

[18] *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 484 (D.C. Cir. 2020).

[19] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

[20] *Circus Circus Casinos*, 961 F.3d at 484 (quoting *Sutter East Bay Hospitals v. NLRB*, 687 F.3d 424, 437 (D.C. Cir. 2012)).

conduct" in the aftermath of their altercation, strongly indicate that she sought his punishment.[21]  For example:

- Boone was Williams' friend; McLamb was not.

- Boone and Williams supported the Union; McLamb did not.

- Boone supported Williams' slate of union candidates; McLamb ran on an opposing slate.

- McLamb had insulted Boone (Williams' friend and ally) in a dispute that ended with Boone hitting McLamb and thereby jeopardizing Boone's job.

- Williams recounted the incident to management in what both the ALJ and the Board called a "categorically dishonest" and one-sided witness statement, which cast Boone as an innocent victim of McLamb's verbal abuse.[22]

- Similarly, Williams gave "slanted testimony" before the ALJ, again heavily favoring Boone over McLamb.[23]

---

[21] *See Graphic Communications Conference – Teamsters Local Union No. 735-S*, 369 NLRB No. 97, 2020 WL 3048007, at *4 (June 5, 2020) (contextual considerations like the union agent's "course of conduct" may "warrant[ ] the inference of an implied request that an employee be disciplined" (cleaned up)); *Avon Roofing & Sheet Metal Co.*, 312 NLRB 499, 499 (1993) ("direct evidence of an express demand by the Union is not necessary where the evidence supports a reasonable inference of a union request"); *see also Local No. 454, United Food & Commercial Workers*, 245 NLRB 1295, 1297 (1979) ("conduct amount[ing] to" a request for "discharge or disciplining," though "never explicitly requested," violates the NLRA).

[22] R. 526, 602.

[23] R. 522 n.7.

In short, the record shows that Williams had a strong bias against McLamb and a clear motive to request that he be punished.

The immediate context of Boone's disciplinary meeting with the general manager is even more illuminating. When Williams spoke, she knew that a punishment for Boone was inevitable. So her "if" (as in "if" you punish Boone) was really a "when" (as in "when" you punish Boone). After all, *Boone had hit a colleague in the face*, and the general manager had (not surprisingly) identified that conduct as "terminable."[24]

Considered in this light, Williams' "conditional" statement implied a request: If Boone is going to be fired (or otherwise punished) — and we all know that she is — the company should fire (or otherwise punish) McLamb too.[25]

Board precedents have found implied requests for discipline in statements less explicit than Williams' statement here. For example, the Board has found that merely "mention[ing] a disciplinary rule" and asking, "Does the rule apply to everyone?" can create an implied request for discipline — even when the union member's "purpose" in asking was to lay a "foundation for a grievance on behalf of" someone else.[26] Likewise, the Board has deemed it an implied request for discipline to "report[] an allegation of . . . harassment to the Employer with full knowledge of the

---

[24] R. 259, 525.

[25] R. 595.

[26] *Local No. 454*, 245 NLRB at 1297.

Employer's rules concerning such conduct" and with some "inferable" "animus" toward the person reported.[27]

Williams' conduct falls well within those precedents. She broached McLamb's conduct at Boone's meeting, overtly stated that McLamb violated company policy, and linked a proposed punishment for McLamb to the inevitable punishment of Boone.[28] So Williams (at least implicitly) requested that McLamb face discipline.

That request violated the NLRA.

**B**

As for step two, substantial evidence does not support the Board's conclusion that Williams acted "in good faith, based on rational considerations, and . . . linked in some way to the

---

[27] *United Paperworkers International Union, Local 1048*, 323 NLRB 1042, 1044 (1997); *see also Graphic Communications*, 369 NLRB at *3-4 (union member "stat[ing] that she wanted an investigation" and that "the Employer had disciplined people for less" constituted an implied request for discipline).

[28] *See* Williams' testimony at R. 259 ("I said [to the general manager], 'Well, you know, harassing someone for that length of time is prohibited conduct, so whatever you decide to do, it should be fair. It should be equal.'"); R. 260 (agreeing to counsel's statement: "You mentioned that Mr. McLamb might have run afoul of some policies concerning harassment."); R. 261 ("The prohibited conduct is on page 12 [of the employee handbook]. You do not harass anybody verbally."); R. 262 (testifying that McLamb violated that rule); *see also* R. 271 (Counsel: "[D]id you believe that it would be fair to treat . . . Mr. McLamb or Ms. Boone differently than the other, as far as discipline is concerned?" Williams: "No.").

Union's need effectively to represent its constituency as a whole."[29]

For starters, Williams provided a "categorically dishonest" witness statement and "slanted" testimony that favored Boone and strongly disfavored McLamb — strong indicators of bad faith.[30] And Williams illegally acted with that bad faith when she requested that the company fire McLamb if it fired Boone.

The Board called Williams' request a "good faith" tactic to "raise the stakes" to help save both employees' jobs.[31] But for two reasons, no substantial evidence supports that "post-hoc rationalization" of Williams' illegal, bad-faith request that the company punish McLamb.[32]

First, McLamb's job was not in jeopardy. So, contrary to the Board's suggestion, Williams could not have been trying to save McLamb's job.[33] To the contrary, Williams *imperiled*

---

[29] R. 595 (cleaned up).

[30] First quoting R. 526, then quoting R. 522 n.7. *See Ruisi v. NLRB*, 856 F.3d 1031, 1038 (D.C. Cir. 2017) ("A union commits a bad faith violation of the duty of fair representation when it engages in fraud, or deceitful or dishonest action." (cleaned up)); *see also International Union of Electronic, Electrical, Salaried, Machine & Furniture Workers v. NLRB*, 41 F.3d 1532, 1538 (D.C. Cir. 1994) ("bad-faith violation of duty of fair representation" when union makes "serious misrepresentations" that "are improperly motivated" (cleaned up)).

The Board acknowledged Williams' bias and even disclaimed reliance on her discredited testimony.

[31] R. 595.

[32] R. 597 (Member Kaplan, dissenting in part).

[33] R. 595 (concluding that the "gist of Williams' argument" was "that *neither* employee should be fired").

McLamb's job by raising the prospect of McLamb's removal when the general manager had not yet suggested *any* disciplinary action against McLamb.[34]

Second, Williams' statement rested on a dubious premise — that hurtful words equate to physical violence.[35] But at the risk of stating the obvious, in the workplace, non-violence is better than violence. So an insult and a hit to the face will not always merit "equal . . . punishment."[36] And no union shop steward acting "in good faith, based on rational considerations" would think so.[37]

By equating McLamb's (poor) conduct with Boone's (worse) conduct, Williams imperiled McLamb's job and violated her duty of fair representation.

\* \* \*

Williams did not have to like McLamb. But as a union shop steward, she owed him a duty of fair representation. And Williams violated that duty by trying to convince McLamb's employer to punish him.

---

[34] R. 597 (Member Kaplan, dissenting in part).

[35] R. 270 (Williams' testimony) ("Q. Do you think that [physical attacks, fighting, pushing, or shoving] [are] equal to verbal harassment? A. Yes."); *see* R. 552 (Union's Exceptions to ALJ Decision) ("Insulting statements may not be the equivalent of physical violence in *every* instance, but the circumstances of *this* case warrant additional consideration." (emphases added)).

[36] R. 259.

[37] *Operative Plasterers & Cement Masons, Local No. 299*, 257 NLRB 1386, 1395 (1981).

Because the court denies McLamb's petition for review of the Board's contrary decision, I respectfully dissent.[38]

---

[38] I dissent only from the court's decision about McLamb's § 8(b)(2) claim. I join Section II.B. of the court's opinion because I agree that the Board had substantial evidence for its conclusion on McLamb's § 8(b)(1)(A) claim.